AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 07/2013)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) ) ) ) ) ) | Case No. 2:21-MJ-05299 |
| The person of RAFAEL DA SILVA NOGUEIRA | | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC Sections 2252A(a)(2), 2252A(a)(5)(B) | Receipt and Possession of Child Pornography |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Natlie Bruford
*Applicant's signature*

Natalie Bruford, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Gail Standish, United States Magistrate Judge
*Printed name and title*

AUSA: Joseph Axelrad, x7964

**ATTACHMENT A-2**

**PERSON TO BE SEARCHED**

The person to be searched, including the property that is on his person, is Rafael Da Silva Nogueira ("NOGUEIRA"), date of birth July 13, 1989.  According to California Department of Motor Vehicles, NOGUEIRA is described as 5'08", 137 pounds, with black hair and black eyes.  The search of the aforementioned person shall include: any and all clothing and personal belongings, any digital devices, bags, or other containers carried or held by the person, or within the person's immediate vicinity and control at the time and location that the search is executed, provided that NOGUEIRA is located within the SUBJECT PREMISES and/or the Central District of California at the time of the search.



California Department of Motor Vehicles Image Record, dated 3/19/2021, expires 7/13/23

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), namely:

a.   Child pornography, as defined in Title 18, United States Code, Section 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, in interstate commerce, including by computer, involving any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(B).

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that discuss, depict, or evidence any minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f.   Any and all records, documents, programs, applications, messages, notes, materials, or items that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

g.   Any and all records, documents, programs, applications, notes, materials, or items, including electronic mail and electronic messages, which discuss or otherwise may be related to the sex exploitation of children.

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to KIK.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

l.   Any digital device, including but not limited to an Apple iPhone, which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   Any phone book, call log, or call records, digital or otherwise.

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.  evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.   records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar

facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files
contained therein is/are encrypted.

       h.   After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    5.   In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

       a.   Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

       b.   Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

       c.   Any magnetic, electronic, or optical storage
device capable of storing digital data;

       d.   Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

       e.   Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

       f.   Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, with respect to an individual reasonably believed to be a resident of the SUBJECT PREMISES and/or SUBJECT PERSON, and is the user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and/or is on SUBJECT PERSON's person, and which falls within the scope of the warrant, law enforcement personnel are authorized to: (1) direct the individual to depress the thumb- and/or fingerprints of the individual onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the individual with his/her eyes open (which law enforcement may direct) to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Natalie A Bruford, being duly sworn, declare and state as follows:

## I.  **INTRODUCTION**

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2017. I am currently assigned to the Los Angeles Field Office where I have been working on the Violent Crimes Against Children Squad since September 2020.  I am also assigned to the multi-agency child exploitation task force known as the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team and the Los Angeles Innocence Lost Task Force.  The SAFE Team is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. § 2251, et seq.  Through my work with the FBI, I have participated in child pornography investigations and executions of search warrants concerning those offenders.  I currently investigate criminal violations relating to the possession and production of child pornography in violation of 18 U.S.C. § 2252A.

2.  I have also received formal training regarding crimes against children.  Through both my training and experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children, and how people use the electronic devices and the Internet to commit crimes related to the sexual exploitation of children.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.     This affidavit is made in support of an application for a warrant to search:

     a.    the premises located at 1274 N. Crescent Heights Blvd Apt 132, West Hollywood, CA 90046 ("SUBJECT PREMISES"), more fully described in Attachment A-1, and;

     b.    the person of RAFAEL DA SILVA NOGUEIRA (hereafter, the "SUBJECT PERSON"), more fully described in Attachment A-2.  Attachments A-1 and A-2 are incorporated herein by reference.

4.     The requested warrants seek authority to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) (collectively, the "SUBJECT OFFENSES"), more fully described in Attachment B, which is attached herein by reference.

5.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    FBI Milwaukee, in collaboration with the Winnebago
County Sheriff's Office, investigated numerous groups of
individuals engaged in the receipt, possession, distribution and
possible production of Child Sexual Abuse Material ("CSAM.")  On
January 16, 2020, an online covert employee ("OCE") from the
Winnebago County Sheriff's Office was invited to join multiple
private groups within the Kik messenger application that had
members openly engaging in the distribution of CSAM.  Two groups
in particular were titled "Ped Nation GC," and "Nepi Nation pvt
1."  During the investigation, the OCE observed Kik user
"rafindian" distribute CSAM to the "Ped Nation GC" and
"Nepi Nation pvt 1" Kik groups, specifically, Kik user
"rafindian" distributed two videos depicting child pornography
on June 4, 2020 and July 13, 2020.  Additionally, on June 13,
2020, "rafindian" distributed three CSAM videos that were
subsequently reported by MediaLab/Kik to the National Center for
Missing and Exploited Children ("NCMEC") via a CyberTipline
Report.

7.    Based on the investigation that followed, law
enforcement determined that NOGUEIRA – the SUBJECT PERSON – used
an IP address associated with the SUBJECT PREMISES during his
distribution of CSAM observed by the OCE, as well as his
distribution of CSAM observed by MediaLab/Kik.

8.    Based on my training and experience, as well as my
familiarity with this investigation, I believe probable cause

exists that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES and on the SUBJECT PERSON.

## IV. DEFINITION OF TERMS

9.    The following terms have the indicated meaning in this affidavit:

a.    The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in Title 18, United States Code, Section 2256.

b.    The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

c.    The term "email" (electronic mail) is defined as the messages sent from one person to another via a computer. Email may also include files sent as attachments to or embedded within text messages.  Email can also be sent automatically to a large number of addresses via a mailing list.

d.    The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of computer networks, online services, and single user components.  In order to access the Internet, an individual computer or digital device user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.    The term "Internet Protocol" ("IP") is defined as
the primary protocol upon which the Internet is based.   IP
allows a packet of information to travel through multiple
networks (groups of linked computers) on the way to its ultimate
destination.

f.    The term "IP Address" is defined as a unique
number assigned to each computer or digital device directly
connected to the Internet.   Each computer or device connected to
the Internet is assigned a unique IP address while it is
connected (for example, 172.191.142.150).   The IP address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning
that the IP address is only assigned for the duration of that
online session.

g.    The term "Internet Service Provider" ("ISP") is
defined as a business that allows a user to dial into or link
through its computers thereby allowing the user to connect to
the Internet for a fee.   ISPs generally provide only an Internet
connection, an electronic mail address, and maybe Internet
browsing software.   A user can also connect to the Internet
through a commercial online service such as AT&T, Verizon, or
Time Warner Cable.   With this kind of connection, the user gets
Internet access and the proprietary features offered by the
online service, such as chat rooms and searchable databases.

h.    The term "Cloud Storage" is defined as a network
of online storage where data is saved in virtual storage that is
hosted by third parties.   The hosting companies operate large

data centers, possibly across multiple servers.  Cloud storage
allows users to save files and data online and access their
information from anywhere using any digital device with an
Internet connection.

      i.    The terms "jpeg," "jpg," "gif," "bmp," and "art"
are defined as graphic image files, namely, pictures.

      j.    The terms "mpeg," "mpg," "mov," "avi," "rm," and
"wmv" are defined as video or movie files.  To use these video
files, one needs a personal computer or other digital device
with sufficient processor speed, internal memory, and hard disk
space to handle and play typically large video files.  One also
needs a video file viewer or client software that plays video
files.  One can download shareware or commercial video players
from numerous sites on the Internet.

      k.    The term "open source" is defined as software
that includes a free license; in other words, it is freely
available to everyone using the Internet.

      l.    The term "chat" means any kind of communication
over the Internet that consists of the real-time transmission of
messages between two or more users.  Chat messages enable
participants to respond quickly to one another and in a format
that is similar to an oral conversation.  This feature
distinguishes chatting from other text-based online
communications such as Internet forums and e-mail.

## V.   BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND FILE SHARING THROUGH MESSENGER APPLICATIONS

10.   Based upon my training and experience in the investigation of child pornography and information related to me by other law enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography:

11.   Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

12.   Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer and digital device users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography

is extremely mobile and such digital files are easily
reproduced, transported, and stored.  For example, with the
click of a button, someone trading images and videos containing
child pornography with others through an online instant
messaging application can be copied and put onto other digital
devices or media storage devices such as external hard drives
small enough to fit onto a keychain.  Just as easily, these
files can be copied onto compact disks and/or stored on mobile
digital devices, such as smart phones and tablets.  Furthermore,
even if the actual child pornography files are stored on a
"cloud," files stored in this manner can only be accessed via a
digital device.  Therefore, viewing this child pornography would
require a computer, smartphone, tablet, or some other digital
device that allows the user to access and view files on the
Internet.

13.  A growing phenomenon in mobile devices and smart
phones is the use of applications, commonly known as "apps," to
communicate between users.  One such "app" is called KIK
Messenger ("KIK").  "KIK" is a free chat application for mobile
devices in which users can send text messages, photographs,
videos, links, and other digital data to other users. KIK users
can communicate directly with an individual or with multiple
users in a group chat. When signing up for a KIK account, a user
supplies an email address, a unique username, and a display name
that is seen when chatting with other users.  KIK is available
for download through the iOS App Store and the Google Play store
for most iOS and Samsung compatible phones and tablets.  As more

people are using their smart phones and mobile devices as their primary internet device, applications like KIK are used more frequently.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Kik User "rafindian" Distributes Child Pornography

14.   The FBI in Milwaukee, Wisconsin, in collaboration with the Winnebago County Sheriff's Office, conducted an investigation into numerous groups of individuals suspected to be engaged in the receipt, possession, distribution and possible production of CSAM.

15.   On January 16, 2020, an OCE from the Winnebago County Sheriff's Office began an investigation utilizing the Kik Messenger application.  The OCE entered multiple Kik groups that appeared to have been created for individuals interested in CSAM.  During the investigation, the OCE was invited to join multiple private groups within Kik that had members openly engaging in the distribution of CSAM.  Two groups in particular were titled "Ped Nation GC," and "Nepi Nation pvt 1."

16.   While participating in the groups, the OCE observed Kik user "rafindian" distribute CSAM to the "Ped Nation GC" and "Nepi Nation pvt 1" Kik groups, specifically, Kik user "rafindian" distributed two videos depicting child pornography on June 4, 2020 and July 13, 2020.  Specifically, these videos include the following:

a.   Video 1 (File Name: IMG_6272.MP4, 1.5 MB, modified 06/04/2020) depicts a prepubescent female approximately

6 to 7 years old standing in a kitchen.  An adult male is standing with his erect penis out behind her and rubbing his penis on her back without her knowing.  This video was sent on June 4, 2020, at approximately 9:00 a.m. CST.

b.   Video 2 (File Name: IMG_2214.MP4, 788 KB, modified 07/11/2020, File Name: IMG_2180.MP4, 788 KB, modified 07/11/2020), depicts a nude prepubescent female approximately 6 to 9 years old bent over an adult male's lap.[1]  An adult male is spreading the prepubescent female's buttocks open exposing her vagina and anus and begins to rub the prepubescent female's vagina.  This video was sent on July 13, 2020, at approximately 10:50 a.m. CST.

17.  FBI Milwaukee sent a subpoena to Kik requesting subscriber data for this account.  The response from Kik, dated September 18, 2020 provided the following:

- First Name: Zerozero
- Last Name: Xxx
- Email: brunolasse24@gmail.com (unconfirmed)
- Username: rafindian

Additional Account Information:

- June 5, 2017, FIRST NAME: Rafindian
- June 5, 2017, LASTNAME: Rafinada
- June 5, 2017, EMAIL: rafindio@hotmail.com (unconfirmed)

---

[1]  These appear to be the same video, modified on the same date and time.  However, they reside in separate subfiles and have alternative file names)

- June 5, 2017, REGISTRATION CLIENT INFO birthday: 1989-07-13
- June 20, 2019, FIRST NAME: BBrazilianPig
- June 20, 2019, LAST NAME: Weho
- June 5, 2020, PROFILE PIC URL:
  http://profilepics.kik.com/Ffxpx3IBHX6Puoo5QCjzZfmm1-Y/orig.jpg (37501 bytes) - original MD5:
  34BE37AB48F5D1BB32B3ADD82190C2E3, scaled MD5:
  1CFF58D79A579BF27039F1ED3296A5CE, ip: 107.184.243.54
- August 8, 2020, USER LOCATION: US (ip: 107.184.243.54)
  (resolving to Charter)

B.   **Identification of SUBJECT PREMISES**

18.  On September 24, 2020, FBI Milwaukee sent a subpoena to Charter Communications requesting subscriber information for IP address 107.184.243.54.  On October 1, 2020, Charter Communications provided subscriber information as follows:

- Subscriber Name: Claudio Martins
- Subscriber Address: 1274 N. Crescent Heights Blvd Apt 132, West Hollywood, CA 90046.
- Current Lease Start: 8/11/2018 3:44:46 PM

19.  Given the location of the SUBJECT PREMISES a lead was passed to FBI Los Angeles on or around February 8, 2021, and assigned to me, SA Natalie Bruford.  A full investigation was initiated on or around March 3, 2021.

C.   **Identification of SUBJECT PERSON**

20.  At my request, on or around March 30, 2021, law enforcement conducted an internal FBI database and open-source

review regarding the SUBJECT PREMISES.  In addition to occupant Claudio Martins, law enforcement determined that an individual named Rafael Da Silva Nogueira (aka "Rafael Dasilva Nogueira," aka "Rafael Dasilvanogueira," and aka "Rafael Nogueira") – the SUBJECT PERSON - is associated with the SUBJECT PREMISES. Public records indicated the SUBJECT PERSON has been associated with the SUBJECT PREMISES since September 2018 and remains affiliated with the SUBJECT PREMISES.  Law enforcement also queried various criminal history and immigration databases and learned that the SUBJECT PERSON is a Brazilian national currently in the United States on a visa.

21.  Law enforcement also reviewed the KIK subpoena return which included email addresses brunolasse24@gmail.com, rafindio@hotmail.com, and the username "rafindian."  Based on the email address rafindio@hotmail.com, further open source research was conducted on the possible username of "rafindio" which yielded positive results for social media accounts associated with the SUBJECT PERSON.

22.  During the search of open source for social media, law enforcement discovered the following:

    - Facebook: rafael.rafindio (UID: 100000609626973)

    - Flickr: rafindio

    - FourSquare: rafindio

    - Google: brunolasse24@gmail.com (UID:
      112321157649327174178)

    - Instagram: rafindio (UID: 30778145)

12

- Kik: rafindian (username); brunolasse24@gmail.com and rafindio@hotmail.com (same account)
- LinkedIn: rafaelnogueira2
- Pinterest: rafaelrafindio
- Skype: brunolasse24@gmail.com (username brunolass24 and display name bruno lasse), rafael.uruguay (same display name), rafindio (same display name), eduardo.uruguay1 (same display name - possible)
- Twitter: rafindio, rafindian (possible)
- Website: rafindiodesigner.blogspot.com
- YouTube: rafindio, rafindian (possible)

23.  The SUBJECT PERSON additionally provided the email addresses rafindio@gmail.com and rafindio@yahoo.com on his 2016 H-4 and B-1/B-2 visa applications, respectively.

24.  At my request, on or about March 31, 2021, SA Gabriel Walsh served an administrative subpoena on Charter, Inc. for account information relating to IP address: 107.184.243.54 Charter, Inc.  Charter provided a return on or about April 8, 2021, and confirmed that the IP Address 107.184.243.54 from the period of June 1, 2020 thru March 30, 20201, was still subscribed to Claudio Martins, at the SUBJECT PREMISES.

25.  On or around March 25, 2021, FBI Los Angeles ran the username "rafindian" through the Internet Crimes Against Children Data Systems with negative results.  However, the IP address 107.184.243.54 came backed attached to a July 2020 Los Angeles Police Department case associated with a NCMEC CyberTipline Report.  On July 8, 2020 NCMEC received a Cybertip

from MediaLab/Kik regarding four files.  The first file
contained the subscriber data of "rafindian" and the following
three files contained "apparent child pornography."

26.  All three videos were uploaded from the IP address
107.184.243.54, on June 13, 2020.  On June 21, 2021, I reviewed
the three uploaded videos, and all three appeared to contain
CSAM of prepubescent children.  For example, filename: 5818c61c-
3e45-49f0-b802-bca05422dcb1.mp4, MD5:
f6487cb9351e154c4bd6ea0d07a3841f, is a video approximately 2
minutes in length that depicts a prepubescent female laying on
her back, she is not wearing any pants or underwear.  Her legs
are raised to expose her vagina.  An adult male begins to suck
on her vagina.  The two speak to one another in what sounds to
be an Asian dialect.  The child appears to be laughing and
crying while the male performs oral copulation on her.  The male
periodically breaks to wipe the child's vagina with a tissue.
When the male appears to begin penetrating her with his penis
the child cries.

27.  On September 16, 2021, myself and TFO Miguel Radillo,
knocked on the door of the SUBJECT PREMISES, under the pretext
of investigating a potential vehicle collision.  The SUBJECT
PERSON answered the door, stated his name was "Rafael," and
confirmed that he lives in the residence with his husband, who
provided his name as "Claudio Martins."  Claudio Martins stated
that due to the pandemic he has been working from home and that
the couple is originally from Brazil.

28.  It is believed by FBI Los Angeles that the individual utilizing the Kik username "rafindian" is the SUBJECT PERSON based upon the fact that the established account was registered with the same birthday as the SUBJECT PERSON.  The Kik user registered their first and last name as "BBrazilanPig" and "WeHo", and the SUBJECT PERSON immigrated from Brazil and currently resides in West Hollywood (commonly referred to as WeHo).  Based on open-source research, it was determined that the SUBJECT PERSON has established a social media presence that consistently utilizes the usernames "rafindian" and "rafindio". Additionally, the SUBJECT PERSON has been positively identified by law enforcement to reside at the IP registered location.

29.  Accordingly, based on the investigation as well as my training and experience, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES and on the SUBJECT PERSON.  Specifically, individuals involved in the SUBJECT OFFENSES tend to keep for long periods of time images and/or videos of child pornography.  Individuals, such as the SUBJECT PERSON, are likely to possess these videos and images within their residence, on digital devices stored within their residence, and on digital devices kept on their person.  Keeping and maintaining these images and/or videos in their residence and on their person allows for quick and immediate access to the images and/or videos.

## VII. <u>TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE SEXUAL INTEREST IN CHILDREN</u>

30.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to individuals with a sexual interest in children and images of children:

a.  Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, in person, in photographs, or in other visual media; or from literature describing such activity.

b.  Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  This includes collecting images or videos traded with other like-minded individuals through online messaging applications such as KIK. Individuals who have a sexual interest in children or images of children oftentimes transfer, maintain, and store such materials, and use them for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to

arouse the selected child partner, or to demonstrate the desired sexual acts.

　　　　c.　Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, and etcetera.  As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography, including materials they may have obtained from, or shared with, other individuals through chat and file-sharing applications in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet.  Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years.  They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure.  These collections are typically highly valued.

　　　　d.　Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/ collectors; may conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child

pornography.  Additionally, individuals who receive or share child pornography with other online users often keep backups and copies of those materials on other digital or storage devices in their homes, cars, or other nearby locations.

      e.  Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

31.  Based on my training and experience, as well as my conversations with digital forensics agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via computer.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery"

18

file.  Similarly, files that have been viewed via the Internet
are automatically downloaded into a temporary Internet directory
or cache.  The browser typically maintains a fixed amount of
hard drive space devoted to these files, and the files are only
overwritten as they are replaced with more recently viewed
Internet pages.  Thus, the ability to retrieve residue of an
electronic file from a hard drive depends less on when the file
was downloaded or viewed than on a particular user's operating
system, storage capacity, and computer habits.  Because computer
evidence is recoverable after long periods of time, and because
there is probable cause to believe that persons at the SUBJECT
PREMISES were once in possession of child pornography and likely
obtained it from some as yet unidentified source, there is
probable cause to believe that evidence of activity related to
the distribution, receipt, and possession and distribution of
child pornography will be found at the SUBJECT PREMISES and on
the SUBJECT PERSON.

        VIII.        **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

    32.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,

monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,

compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2]  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been

22

responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

            f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may

be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or

alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

33.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five

fingerprints that can unlock a device.  Once a fingerprint is
registered, a user can unlock the device by pressing the
relevant finger to the device's Touch ID sensor, which on a cell
phone is found in the round button (often referred to as the
"home" button) located at the bottom center of the front of the
phone, and on a laptop is located on the right side of the
"Touch Bar" located directly above the keyboard.  Fingerprint-
recognition features are increasingly common on modern digital
devices.  For example, for Apple products, all iPhone 5S to
iPhone 8 models, as well as iPads (5th generation or later),
iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.
Motorola, HTC, LG, and Samsung, among other companies, also
produce phones with fingerprint sensors to enable biometric
unlock by fingerprint.  The fingerprint sensors for these
companies have different names but operate similarly to Touch
ID.

          c.   If a device is equipped with a facial-recognition
feature, a user may enable the ability to unlock the device
through his or her face.  To activate the facial-recognition
feature, a user must hold the device in front of his or her
face.  The device's camera analyzes and records data based on
the user's facial characteristics.  The device is then
automatically unlocked if the camera detects a face with
characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is

often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring
2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

          d.   While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition

27

features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

34.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

35.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a

28

remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

36.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is

found at the SUBJECT PREMISES and reasonably believed by law
enforcement to be a user of the device to unlock the device
using biometric features in the same manner as discussed in the
following paragraph.

37.   For these reasons, if while executing the warrant, law
enforcement personnel encounter a digital device that may be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel
to, with respect to the SUBJECT PERSON to be the user of a
biometric sensor-enabled device that is (a) located at the
SUBJECT PREMISES and (b) falls within the scope of the warrant:
(1) compel the use of the person's thumb- and/or fingerprints on
the device(s); and (2) hold the device(s) in front of the face
of the person with his or her eyes open to activate the facial-,
iris-, and/or retina-recognition feature.  With respect to
fingerprint sensor-enabled devices, although I do not know which
of the fingers are authorized to access any given device, I know
based on my training and experience that it is common for people
to use one of their thumbs or index fingers for fingerprint
sensors; and, in any event, all that would result from
successive failed attempts is the requirement to use the
authorized passcode or password Other than what has been
described herein, to my knowledge, the United States has not
attempted to obtain this data by other means.

38.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## IX. __CONCLUSION__

39.   Based on the foregoing, there is probable cause to believe that evidence, fruits and instrumentalities of the SUBJECT OFFENSES, as described above and in Attachment B, will be found in a search of the SUBJECT PREMISES, as described in Attachment A-1, and/or the SUBJECT PERSON, as described in Attachment A-2 of this affidavit.

_____
NATALIE BRUFORD,
Special Agent,
Federal Bureau of Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __ day of
November, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

31